`

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELIODORO A. SILVA, | No.  1:20-cv-01442-NONE-SKO (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| GIGI PATTERSON, Warden, | **[THIRTY DAY OBJECTION DEADLINE]** |
| Respondent. | |

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is currently in state prison serving two consecutive life sentences without possibility of parole for two counts of first degree murder with special circumstances.  The habeas petition presents six claims challenging the conviction.[1] As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

**I.      PROCEDURAL HISTORY**

On November 4, 2016, a Merced County jury found Petitioner guilty of two counts of first degree murder (Cal. Penal Code § 189) with multiple murder and kidnapping special circumstances (Cal. Penal Code §§ 190.2(a)(3), (a)(17)), and two counts of kidnapping (Cal.

---

[1] Claims seven through thirteen were dismissed by the Court on April 1, 2021. (Doc. 16.)

Penal Code § 207(a)) with true findings on enhancement allegations that a principal was armed with a firearm (Cal. Penal Code § 12022(a)(1)).  (Doc. 1 at 1; 11-19 at 2.[2])  On December 8, 2016, the court sentenced him to two consecutive terms of life without possibility of parole for the murders and consecutive sentences of eight years and five years for the kidnappings, plus one year for each arming enhancement.  (Doc. 1 at 1.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On August 7, 2019, the Fifth DCA struck a parole revocation restitution fine, but affirmed the judgment in all other respects.  People v. Silva, No. F074899, 2019 WL 3714594, at *1 (Cal. Ct. App. 2019).  Petitioner filed a petition for review in the California Supreme Court. (Doc. 1-17.)  On November 20, 2019, the California Supreme Court summarily denied the petition.  (Doc. 1-18.)

On April 10, 2020, Petitioner filed a habeas petition in the Merced County Superior Court. (Doc. 11-22.)  The claims were denied in a reasoned decision on May 13, 2020.  (Doc. 11-23.)

On May 28, 2020, Petitioner raised the claims in a habeas petition to the California Court of Appeal, Fifth Appellate District (Fifth DCA).  (Doc. 11-24.)  On June 4, 2020, the court denied the petition on procedural grounds.  (Doc. 11-25.)

On June 25, 2020, Petitioner filed a second habeas petition in the Fifth DCA. (Doc. 11-26.)  On July 2, 2020, the appellate court denied the petition on procedural grounds.  (Doc. 11-27.)

On July 22, 2020, Petitioner filed a third habeas petition in the Fifth DCA. (Doc. 11-28.) On July 30, 2020, the court denied the petition again on procedural grounds. (Doc. 11-29.)

On August 11, 2020, Petitioner filed a petition for review in the California Supreme Court. (Doc. 11-30.)  The petition was denied without comment on September 16, 2020. (Doc. 11-31.)

On October 9, 2020, Petitioner filed the instant habeas petition for writ of habeas corpus in this Court.  (Doc. 1.)  On April 1, 2021, the District Court granted Respondent's motion to dismiss claims 7 through 13 as unexhausted.  (Doc. 16.)  Respondent filed an answer to the

---

[2] Unless otherwise noted, references are to ECF pagination.

exhausted claims on December 1, 2021. (Doc. 37.)  On December 20, 2021, Petitioner filed a traverse to Respondent's answer. (Doc. 39.)

## II.    FACTUAL BACKGROUND

The facts are derived from the appellate court's Statement of Facts in its unpublished decision[3]:

### *Accomplice Testimony*

The prosecution's key witness at trial was Petitioner's nephew, Salvador Silva (hereinafter "Salvador").   Salvador had been a defendant in the case, charged with kidnapping and murder, but he entered into an agreement with the prosecution under which both murder charges and one kidnapping charge were dismissed, in exchange for his testimony at trial and his plea of guilty to the other kidnapping charge, with probation and no prison time.

Salvador testified that at the time of the killings, he lived in a house behind Petitioner's house in Atwater. There was an enclosure on the property in which Petitioner grew marijuana for sale.  At Petitioner's house, people frequently came and went, including R.G. and R.S., the murder victims.  R.S. was the nephew of R.G.  Other men Salvador saw at Petitioner's house included Bernardo Rangel, Monico Peña, Peña's nephew, called Junior, and another nephew of Petitioner named Gerardo Silva (hereinafter "Gerardo").

According to Salvador, there was another marijuana grow at a separate location operated by Gerardo, Peña, Rangel, R.S. and R.G.  Petitioner and R.S. also maintained a third grow.

Around the beginning of October 2014, Gerardo arrived at Salvador's house and said someone was doing something among the marijuana plants.  Gerardo thought it was the police and ran away.  A few days later, Peña and Gerardo looked inside the enclosure and some marijuana plants were missing.

---

[3] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

Later Gerardo, laughing, showed Salvador a picture or video taken with a cell phone, depicting two men being held in Petitioner's house with their faces covered. Salvador did not think the two men were R.G. and R.S. One of them was tied up in a chair and the other was kneeling as someone poured water on him. Someone told Salvador the man had been told the water was acid, and he was screaming. Commenting on the same picture or video, Petitioner said he tried to frighten the men by running a weed eater within their hearing and telling them it was a chain saw. He was trying to find out who stole the marijuana.

About a week before the killings, Petitioner told Salvador he suspected R.G. and R.S. of being the thieves. He was going to ask them about the missing drugs. Subsequently, Petitioner and Gerardo demanded a pound of marijuana from R.G. and R.S. Around this time, Petitioner rented a second house, in Winton, and began living there.

On the evening of Saturday, October 18, 2014, according to Salvador's testimony, he came home to the Atwater property after work, and Petitioner was there. Petitioner asked him to go out with him to buy beer. After they bought the beer, Petitioner drove to another store and told Salvador to go in and buy duct tape. Petitioner said R.G. and R.S. were being held at Petitioner's house at the Atwater property and they were going to be killed for stealing the marijuana. Petitioner said he had deceived them to get them to come to the house by saying they should come get a gun he had been holding for them. Salvador said Petitioner was doing wrong, but Petitioner had a gun in his lap and ordered Salvador to go in and buy the tape, and Salvador complied.

Back at the Atwater property, Rangel came out of Petitioner's house with a gun in his hand. He said he had hit someone on the head with it who was resisting being tied up. Petitioner told Salvador to take the tape inside.

Inside Petitioner's Atwater house, Salvador gave the tape to Gerardo. He saw R.S. sitting with his hands and feet tied with rope. His face and head were bloody. R.G. was not yet tied. Peña and Junior were there. Peña was armed with a two by four and Junior with a stake apparently taken from the ground outside. Someone said they were waiting for another person to bring money, after which R.S. and R.G. would be released. If the money

4

1    was not brought, they would be killed.

2        Petitioner and Rangel appeared to Salvador to be in charge. They held the guns and
3 would give orders—not to let R.S. and R.G. loose unless the money was brought, for
4 instance—and the others would obey. Petitioner said everything would be done as he
5 directed. Sometimes Petitioner and Rangel went off to the side to have conversations apart
6 from the others.

7        Salvador's wife called him and told him to come to dinner. Petitioner told him to go
8 eat and then come back. When he returned, Petitioner and Rangel were not there. Gerardo,
9 Peña, and Junior were in a room with R.S. and R.G. R.S. and R.G. were both tied to chairs
10 now, with their hands and feet bound. They were crying. R.G. asked Salvador to help him
11 get loose. Salvador said the others would kill him if he tried. Rangel then returned, again
12 holding a gun, and told Salvador to wait in the kitchen and not call the police.

13        Later, according to Salvador's testimony, Petitioner and the others all talked about
14 whether they should put R.S. and R.G. in a sort of storage bin that had been built in a hole
15 in the ground on the Atwater property, or take them to Petitioner's house in Winton.
16 Salvador was sent out to get the storage bin ready, but when he came back, the others were
17 preparing to leave with the victims. Their heads had been wrapped in duct tape. Salvador
18 was told not to call the police. He was not told where they were going. He heard nothing
19 more of the matter that night.

20        The following evening, Sunday, October 19, 2014, around 8:00 p.m., Gerardo called
21 Salvador and asked if he wanted some methamphetamine. A coworker had asked Salvador
22 earlier to buy him $50 worth, and Salvador said yes. Petitioner met Salvador at an agreed
23 upon place in a field and sold him the drugs. Petitioner then drove away quickly.

24        On Monday, October 20, 2014, Petitioner called Salvador at his work and asked him
25 to come see him. He gave Salvador directions to the house in Winton. Salvador went there
26 in the evening. Petitioner greeted him and they each had a line of methamphetamine.
27 Gerardo was there, and he and Petitioner had guns at their waists.

28        Salvador asked what had happened to R.S. and R.G. Gerardo said the men were

1   taken to a field and he, Gerardo, had shot R.S. to death.  Petitioner confirmed that Gerardo

2   had killed R.S. by shooting; he said Peña had killed R.G. with a bat.

3          Petitioner or Gerardo said the group had brought the victims to the Winton house

4   after leaving the Atwater house late Saturday night or early Sunday morning.  Petitioner

5   said the victims were tied up at the Winton house all day on Sunday. Gerardo said the group

6   formed a plan to take the victims to the orchard and kill them there. They all agreed that

7   Peña and Gerardo would do the killing.

8          Salvador testified that Petitioner said the group left the Winton house in three cars

9   between 9:00 p.m. and 10:00 p.m. on Sunday and drove to the orchard.  According to

10  Gerardo, Petitioner led the way in the first car.  Peña drove the second car with Gerardo and

11  the victims, and Junior drove the third car.

12         Petitioner told Salvador that when the group reached the intended spot off the road

13  in the orchard, he waited while Gerardo and Peña carried out the planned killings. Petitioner

14  then went to look at the bodies to confirm that they were dead.  The group then placed the

15  bodies in one of the cars.  Gerardo and Peña had come up with the idea of burning the

16  bodies.  Gerardo poured diesel fuel inside the car and Peña lit it with a lighter. Petitioner

17  said he and Gerardo then returned to the Atwater property and built a fire in the yard to burn

18  Gerardo's bloody clothes.

19         On cross-examination, Salvador admitted that on October 22, 2014, when he was

20  first interviewed by the police, he said he went to the orchard with the others and helped to

21  kill R.S. and R.G.  Salvador testified that this was a false confession the detectives induced

22  by saying they already knew he was guilty, and by intimidating him with other pressure

23  tactics.  Salvador conceded he had falsely denied he went into the store to buy the duct tape

24  before he was told there was surveillance video showing him doing it.  He further admitted

25  he told the police he rode to the orchard in the car with Gerardo, R.S. and R.G.; he saw Peña

26  kill R.G. with the bat; he saw R.S. trying to run away and then heard gunshots; he helped

27  place R.G.'s body in the car, and he saw the bodies soaked with fuel.  Afterward, back at

28  the Atwater property, he burned his clothes.  Salvador testified he made all these statements,

1  but they were false.  He never went to the orchard at all, and he told the police lies because
2  they wanted to hear them.

3       *Petitioner's Statement to the Police*

4       The jury heard portions of recorded police interrogations of Petitioner that took
5  place on October 20 and 23, 2014.  He told detectives that on Friday, October 17, 2014,
6  R.S. and R.G. came to his Atwater house, saying they wanted to retrieve a handgun and
7  several pounds of marijuana they had left there some time before.  Gerardo, Salvador, Peña,
8  Junior, and Rangel were there.  Petitioner believed R.S. and R.G. were plotting to kill him
9  and the others one by one because they wanted to increase their share of the marijuana
10 business.  He thought they intended to kill him that day when they got the gun back.  When
11 Petitioner gave R.S. the gun, R.S. immediately pointed it at him.  Rangel and Gerardo fought
12 R.S.; Gerardo took the gun from him.  Gerardo and Rangel tied R.S.'s hands behind his
13 back.  R.G. did not fight and was not yet tied up.  Petitioner then went to the Winton house
14 while the others stayed at the Atwater house with R.S. and R.G. overnight.

15      The next day, Saturday, according to Petitioner's statement to the detectives, he and
16 Salvador bought the duct tape and returned to the Atwater house.  Someone taped the
17 victims' mouths.  At some point during the day, they all drove to the Winton house, where
18 R.S. and R.G. were again detained overnight and remained on Sunday.

19      On Sunday night, Gerardo and Peña put R.S. and R.G. into a car.  With Junior and
20 Petitioner, they drove to the orchard.  Petitioner drove alone in his own car.  He brought a
21 gun with him.  R.S. and R.G. were tied up, but Petitioner believed he was in danger from
22 the others.  He thought they also wanted to kill him so they could take over his business.
23 Salvador did not go.

24      Petitioner told the detectives he stayed in his car at the orchard and did not see what
25 happened.  The others told him Gerardo shot R.S., Peña killed R.G. with a bat, and the
26 bodies were burned with diesel fuel.  They said they burned their clothes back at the Atwater
27 property.

28 /////

7

*Cell Phone Evidence*

An expert on cell phones testified for the prosecution about his conclusions regarding the location of Petitioner's cell phone during a portion of the dates in question, based on an analysis of records identifying cell phone antennas that received signals from Petitioner's phone. The records were consistent with the phone being in the vicinity of the Winton house before 8:43 p.m. on Sunday, October 19, 2014. At that time, a call was made from Petitioner's phone to a number in Mexico which lasted about nine minutes. At some point during those nine minutes, the phone began traveling northward. It reached the vicinity of the crime scene in the orchard around 9:12 p.m. or 9:14 p.m. By about 10:20 p.m., the phone was moving southward again, back toward the vicinity of the Winton house. Sometime after midnight on Monday, October 20, 2014, the phone moved from the area of the Winton house to that of the Atwater house, and remained in that area until around 3:00 a.m.

*Petitioner's Testimony*

Petitioner testified in his own defense. His account of the events leading up to the deaths of the victims differed in some key respects from his statement to the police. Before R.S. pointed the gun at him, he had never had trouble with him, R.G., or anyone else. Gerardo and Rangel struggled with R.S. for the gun, and Gerardo took it and tied R.S. up. Gerardo ordered Petitioner to go buy duct tape. He confiscated Petitioner's car keys and made him drive a different car. Gerardo said that if Petitioner failed to return or called the police, Gerardo would kill Petitioner's children. Petitioner and Salvador drove to a store to get the tape; when they returned, Salvador went inside with the tape. Petitioner was scared and did not go back inside. He knocked on the door to get his car keys back and drove to the Winton house.

Later that night, Gerardo, Peña, and Junior arrived at the Winton house with the victims, Petitioner testified. Gerardo ordered Petitioner to allow him to bring the victims inside. They were tied and had tape over their eyes. Peña and Junior left and Gerardo, Petitioner, and the victims spent the night in the house.

8

In the morning, according to Petitioner's testimony, he got up and told Gerardo he was going to work.  Gerardo told him he had to return afterwards.  Petitioner went to see the victims, who were still tied up, lying on a mattress.  When they asked him for water, Petitioner gave them some water as Gerardo stood nearby with a gun in his hand.

When Petitioner returned that night, Gerardo told him he had to drive to the orchard in his car and he would be in front of the others.  Gerardo and Peña were in the second car with the victims and Junior was alone in the third car.  Gerardo told Petitioner to watch for Gerardo's turn signals so he would know how to get to their destination.  He told Petitioner they would be leaving the victims stranded in the orchard.  He never said they were going to be killed.

When the cars arrived at the orchard, Gerardo drove in with Peña and the victims. Petitioner drove only a short distance in and Junior parked outside.  Petitioner stayed in his car with the windows up and did not see or hear what was happening.  He never saw the fire.  Gerardo returned on foot and Petitioner drove away with him.  Gerardo said R.G. and R.S. had been killed.  Back at the house, Gerardo again warned Petitioner not to go to the police.  Petitioner testified that he still believed he and his family were in danger.  While he was being held in jail before trial, Salvador was his cell mate, and told him that if he was released, he would be killed.

On cross-examination, Petitioner testified that R.G. and R.S. never took any marijuana from him.  He believed they stole some marijuana from Gerardo and Peña because Gerardo and Peña refused to give them their share.  Petitioner had also heard, however, that R.G. and R.S. owed money to Gerardo, Peña, and Rangel.

*Crime Scene Evidence*

The bodies of R.G. and R.S., mostly consumed by fire, were found on October 20, 2014, in a burned-out car in the orchard. They were identified through the use of dental records and DNA analysis.  R.S. died from gunshot wounds to the head.  R.G. died from blunt force trauma to the head, and his larynx had been cut by a sharp implement.

Among items recovered from the scene was a bloody baseball bat bearing one of

9

1    Peña's fingerprints.  Also found at the scene were spent casings from shells determined to

2    have been fired from a .45-caliber semiautomatic handgun discovered under a mattress at

3    the Winton house.  Silva, 2019 WL 3714594, at *1–5.

4    **III.    DISCUSSION**

5            A.       Jurisdiction

6            Relief by way of a petition for writ of habeas corpus extends to a person in custody

7    pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

8    treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

9    529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

10   guaranteed by the United States Constitution.  The challenged conviction arises out of the Merced

11   County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

12   2254(a); 28 U.S.C.§ 2241(d).

13          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

14   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

15   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

16   filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

17   and is therefore governed by its provisions.

18          B.       Legal Standard of Review

19          A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

20   the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

21   that was contrary to, or involved an unreasonable application of, clearly established Federal law,

22   as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

23   based on an unreasonable determination of the facts in light of the evidence presented in the State

24   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

25   Williams, 529 U.S. at 412-413.

26          A state court decision is "contrary to" clearly established federal law "if it applies a rule

27   that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

28   of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

| | |
|---|---|
| 1 | different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405- |
| 2 | 406). |
| 3 |      In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that |
| 4 | an "unreasonable application" of federal law is an objective test that turns on "whether it is |
| 5 | possible that fairminded jurists could disagree" that the state court decision meets the standards |
| 6 | set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable |
| 7 | application of federal law is different from an incorrect application of federal law.'" <u>Cullen v.</u> |
| 8 | <u>Pinholster</u>, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state |
| 9 | court's decision was 'merely wrong' or 'even clear error.'" <u>Shinn v. Kayer</u>, ___ U.S. ___, ___ , |
| 10 | 141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting <u>Virginia v. LeBlanc</u>, 582 U. S. ___, |
| 11 | ___, 137 S.Ct. 1726, 1728 (2017) (*per curiam*)).  Rather, a state prisoner seeking a writ of habeas |
| 12 | corpus from a federal court "must show that the state court's ruling on the claim being presented |
| 13 | in federal court was so lacking in justification that there was an error well understood and |
| 14 | comprehended in existing law *beyond any possibility of fairminded disagreement*." <u>Richter</u>, 562 |
| 15 | U.S. at 103 (emphasis added); <u>see also</u> <u>Kayer</u>, 141 S.Ct. at 523, 2020 WL 7327827, *3.  Congress |
| 16 | "meant" this standard to be "difficult to meet." <u>Richter</u>, 562 U.S. at 102. |
| 17 |      The second prong pertains to state court decisions based on factual findings.  <u>Davis v.</u> |
| 18 | <u>Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)). |
| 19 | Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the |
| 20 | petitioner's claims "resulted in a decision that was based on an unreasonable determination of the |
| 21 | facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539 |
| 22 | U.S. 510, 520 (2003); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's |
| 23 | factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable |
| 24 | among reasonable jurists." <u>Jeffries</u>, 114 F.3d at 1500; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999- |
| 25 | 1001 (9th Cir. 2004), *cert.denied*, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004). |
| 26 |      To determine whether habeas relief is available under § 2254(d), the federal court looks to |
| 27 | the last reasoned state court decision as the basis of the state court's decision.  <u>See</u> <u>Ylst v.</u> |
| 28 | <u>Nunnemaker</u>, 501 U.S. 979, 803 (1991); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. |

1   2004). "[A]lthough we independently review the record, we still defer to the state court's

2   ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

3         The prejudicial impact of any constitutional error is assessed by asking whether the error

4   had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

5   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

6   (holding that the Brecht standard applies whether or not the state court recognized the error and

7   reviewed it for harmlessness).

8         C.      Review of Petition

9         Petitioner raises six exhausted claims in his petition: 1) The trial court erred in instructing

10  the jury with CALCRIM No. 548 on unanimity; 2) The trial court erred by mis-instructing the

11  jury on the intent requirement for the special circumstance for multiple murder; 3) The trial court

12  erred by instructing on "other crimes" which improperly lowered the prosecution's burden of

13  proof; 4) The state court erred by failing to find that Cal. Penal Code § 654 requires that separate

14  sentences for kidnapping be stayed; 5) The trial court erred by instructing on implied malice as a

15  theory to conspiracy to commit murder; 6) The instructions given allowed the jury to find

16  Petitioner guilty of first degree murder on an aiding and abetting theory without the specific intent

17  to kill in violation of his constitutional rights.

18        1.      Instructional Error - Unanimity

19        Petitioner first alleges that the trial court erroneously instructed the jury with CALCRIM

20  No. 548 that they did not need to agree on a theory of murder.  The appellate court addressed this

21  claim on direct review.  The court first determined that Petitioner was correct, and the jury was

22  mis-instructed on unanimity as follows:

23          The trial court used CALCRIM No. 548 to inform the jurors that to return
            convictions on each murder count, each of them had to conclude Heliodoro
24          committed murder under one of the theories presented, but they need not agree on
            which theory. Heliodoro argues that, in a case in which theories of both first degree
25          and second degree murder are made available to the jury, it is error to give this
            instruction.
26
            Heliodoro is correct. In a prosecution for first degree murder, where the jury is
27          presented with multiple theories of first degree murder, and none of second degree
            murder, the jury can properly return a verdict of first degree murder without
28          unanimous agreement on the theory. This is a settled proposition and is the basis of

                                              12

1       CALCRIM No. 548. (*People v. Moore* (2011) 51 Cal.4th 386, 413; *People v. Kipp*
2 (2001) 26 Cal.4th 1100, 1132; *People v. Guerra* (1985) 40 Cal.3d 377, 386.) On the
other hand, if the jury is instructed on theories that could lead to different degrees
of murder, then it is error to instruct the jurors that they need not agree on a theory.
3 (*People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1025; *People v. Johnson* (2016)
243 Cal.App.4th 1247, 1278-1281 (*Johnson*).) This is because a verdict of guilty on
4 a murder charge must include a unanimous decision on the degree of murder.
(*People v. Jones* (2014) 230 Cal.App.4th 373, 376.) It does not help that the jury
5 was separately instructed, in accordance with CALCRIM Nos. 520 and 521, that
they had to decide on the degree of murder. CALCRIM No. 548 implied they could
6 do so nonunanimously. (*Johnson, supra*, 243 Cal.App.4th at pp. 1280-1281.)

7 Silva, 2019 WL 3714594, at *9.

8       The state court determined the error was harmless because the jury unanimously found all

9 of the elements necessary to establish first degree murder based on kidnapping, as follows:

10       The People argue that any such error is harmless under the *Chapman* standard
because, even if jurors *could* have reached a second degree murder verdict consistent
11 with the instructions, ""“other aspects of the verdict or evidence”"” (*Johnson, supra*,
243 Cal.App.4th at p. 1281) show the jury *actually* made all the findings necessary
12 for first degree felony murder. We agree. Under the instructions given in this case,
the *felony murder special circumstance* findings returned by the jury based on
13 kidnapping, along with the verdicts of guilty on the predicate kidnappings, contained
within them findings of all elements of felony murder. (See, e.g., *People v. Jones*
14 (2013) 57 Cal.4th 899, 966-967 [jury instructions on first degree premeditated
murder were defective, but conviction of robbery plus true finding on robbery felony
15 murder special circumstance showed jurors agreed on all elements necessary for
verdict of first degree felony murder based on robbery].)
16
The rationale for relying on a jury's felony murder special circumstance findings to
17 show that instructional errors on other aspects of the murder instructions are
harmless is that "the elements of felony murder and the [felony murder] special
18 circumstance coincide," so the jurors necessarily found all the elements of first
degree felony murder. (*People v. Elliot* (2005) 37 Cal.4th 453, 476.) It is not
19 invariably the case that they coincide, however, so we must be careful.

20 Generally speaking, a jury needs to find *more* elements for a felony murder special
circumstance in addition to those required for felony murder. For all the felony
21 murder special circumstances, for example, it must be proved that the defendant
either was the actual killer, or participated in the underlying felony with an intent to
22 kill, or was a major participant in the underlying felony and acted with reckless
disregard for life. (§ 190.2, subds. (c), (d).) Felony murder requires none of this.
23
If all the discrepancies worked this way—felony murder special circumstances
24 require findings that felony murder does not, but not vice versa—the special
circumstance finding would always encompass felony murder, and we would need
25 to say no more.

26 It appears, however, that the situation might sometimes be reversed. Of significance
here is the fact, mentioned above and reflected in CALCRIM No. 540B, that first
27 degree felony murder requires proof of the defendant's specific intent to commit the
underlying felony. (*Gutierrez, supra*, 28 Cal.4th at p. 1140; *Coefield, supra*, 37
28 Cal.2d at p. 867.) Yet the California Supreme Court has stated: "We have never held

13

that 'specific intent' is required for the felony-murder *special circumstance*. We see no reason to do so now." (*People v. Davis* (1995) 10 Cal.4th 463, 519, italics added.) But a number of years later, the court declined an opportunity to reaffirm this position. In *People v. Prieto* (2003) 30 Cal.4th 226, 257-258, instead of holding that the kidnapping special circumstance instruction was not required to include a specific intent to commit kidnapping, the court avoided that question. It concluded that any error in omitting such an element was harmless in that instance because the evidence compelled the conclusion that defendant had a specific intent to commit kidnapping.

Given this state of things, it might, or might not, be the case that a charge of felony murder can have one element—specific intent to commit the predicate felony—that the corresponding felony murder special circumstance allegation lacks. This opens up the possibility that in some cases, a jury's true finding on a felony murder special circumstance allegation would fail to guarantee that the jury found all the elements of the corresponding felony murder charge were established.

But in this case, whether required or not, the trial court's instruction in accordance with CALCRIM No. 731 on the kidnapping felony murder special circumstance did include a specific intent to commit kidnapping as an element, using the same words for that element as in the CALCRIM No. 540B instruction that the court gave on felony murder based on kidnapping. Nor was anything else that appeared in the felony murder instruction missing from the felony murder special circumstance instruction.

Under these circumstances, the jury necessarily found all the elements of first degree felony murder. The erroneous use of CALCRIM No. 548 gave rise to a danger that some jurors would accept one of the theories of first degree murder while others would be unwilling to go beyond the findings necessary for one of the theories of second degree murder. But the outcome, because it includes the kidnapping verdicts and the true findings on the kidnapping felony murder special circumstance, shows that this did not come to pass. There were 12 jurors who found everything that was necessary to establish first degree felony murder based on kidnapping. The error of instructing that unanimity was unnecessary thus was harmless beyond a reasonable doubt.

Silva, 2019 WL 3714594, at *10-11.

### a.     Legal Standard

The Court initially notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation; it must be considered in the context of

14

the instructions as a whole and the trial record. <u>See</u> <u>Estelle</u>, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977)); <u>Prantil v. California</u>, 843 F.2d 314, 317 (9th Cir. 1988); <u>see</u>, <u>e.g.</u>, <u>Middleton v. McNeil</u>, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).  Moreover, the petitioner's "burden is especially heavy [where] no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." <u>Henderson</u>, 431 U.S. at 155.

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  <u>Id</u>. (citation omitted); <u>see</u> <u>Calderon v. Coleman</u>, 525 U.S. 141, 146–47 (1998).

b.      Analysis

As noted above, the state court determined that based on the instructions, the jury could have convicted Petitioner of either first or second degree murder.  Nevertheless, the error was harmless because the jury also found the kidnapping special circumstance true.  In making this finding, the jury had to find:

> 1. The defendant committed or aided and abetted or was a member of conspiracy to commit kidnapping;
>
> 2. The defendant intended to commit or intended to aid and abet the perpetrator committing or intended that one or more members of the conspiracy commit kidnapping;
>
> 3. The defendant did an act that was a substantial factor in causing the death of another person; and
>
> 4. The defendant intended that the other person be killed.

15

(Doc. 11-4 at 226.)

In addition, the jury was specifically instructed that this special circumstance finding must be unanimous.  (Doc. 11-4 at 223: "In order for you to return a finding that a special circumstance is or is not true, all 12 of you must agree.")

Therefore, by finding the special circumstance true, the jury necessarily determined unanimously that Petitioner was guilty of first degree murder based on felony murder.  Since the jury's findings amounted to a determination that Petitioner was guilty of first degree murder, the state court reasonably determined that any error in the unanimity instruction was harmless beyond a reasonable doubt.  Petitioner thus fails to demonstrate that the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht, 507 U.S. 619, 637.  The claim should be denied.

2.      Instructional Error – Multiple Murder Special Circumstance

Petitioner next claims his due process rights were violated when the jury was instructed with the multiple murder special circumstance instruction.  Petitioner also raised this claim on direct review in the state courts.  The appellate court determined that Petitioner was correct, that the instruction as given was erroneous:

> Heliodoro points out, and the People concede, that the court used the wrong pattern instruction when instructing the jury on the multiple murder special circumstance. Specifically, the court used an instruction that wrongly allowed the jury to find the multiple murder special circumstance allegation true without finding that Heliodoro had an intent to kill.

Silva, 2019 WL 3714594, at *16.

The appellate court determined that the error was harmless:

> We agree with the People's view that this error was harmless because the jury found under another instruction (for the kidnapping special circumstance) that Heliodoro had an intent to kill.

> Section 190.2, subdivisions (c) and (d), as we have mentioned, set forth extra requirements for special circumstance findings in cases in which the defendant is not the actual killer. Subdivision (c) requires a finding of intent to kill for all special circumstances, while subdivision (d) creates an exception to subdivision (c) for the felony murder special circumstances by allowing the intent to kill finding to be replaced by findings that the defendant was a major participant in the underlying felony and participated in it with reckless indifference to life. At the same time, however, section 190.2, subdivision (a)(17)(M), allows the judicially-

16

created requirement of independent purpose to be dispensed with in the case of the kidnapping and arson special circumstances—but then there must be proof of intent to kill. In this case, the prosecution undertook to prove the kidnapping special circumstance under subdivision (a)(17)(M), so the instructions on *both* the multiple murder special circumstance *and* the kidnapping special circumstance should have required proof of Heliodoro's intent to kill; and the major participant/reckless indifference alternative should not have been mentioned at all. But, as explained above, the court selected the wrong pattern instruction for the multiple murder special circumstance, which allowed the jury to find either that Heliodoro had the intent to kill or (incoherently) that he was a major participant in something unspecified, and participated in that thing with reckless indifference. For this reason, the jury's true finding on the multiple murder special circumstance instruction did not establish the intent to kill requirement for that special circumstance. But because the jury also returned a true finding on the kidnapping special circumstance, the instruction for which *did* require intent to kill as an element, the error in the multiple murder special circumstance was harmless beyond a reasonable doubt. There is no question but that the jury made the necessary finding.

Heliodoro suggests that the jury's finding of intent to kill pursuant to the instruction on the kidnapping special circumstance cannot be relied on because the prosecutor, in closing argument, made remarks that blurred the distinction between the requirements stated in the instruction for the multiple murder special circumstance and those stated in the instruction for the kidnapping special circumstance. These remarks, according to this suggestion, could have led the jury to the erroneous belief that it could find *both* special circumstances true based on a finding that Heliodoro was a major participant in an underlying felony and acted with reckless indifference to life—when in reality the intent to kill was required for both.

The prosecutor was not very precise in his oral description of the mental state elements of the special circumstances, just as the trial court and the person who prepared the jury instructions were imprecise in the written description for the multiple murder special circumstance. To be correct, both the jury instructions and the prosecutor's argument should have stated clearly that both special circumstances required proof of intent to kill; and no reference to major participant/reckless indifference should have been made at all. But the prosecutor argued as follows:

> "Here's some general things about special circumstances. This applies to somebody who's not the actual killer, but who's guilty as [an] aider or abettor or member of a conspiracy, which is what you have here. There's very little evidence, in fact, no evidence that Mr. Silva was the actual killer of [the victims]. But there's powerful, powerful evidence that he was involved in this enterprise from the beginning and, in fact, a leader, someone in charge of this enterprise.

> "So in that instance in a case like this, we have to show the intent to kill, and that could be shown circumstantially from all the evidence and also through direct evidence. In fact, repeatedly over and over again his nephew Salvador Silva said that the plan was to kill these guys. That was what they were saying. And circumstantially, you look at everything. No question that was the plan when they went out to the orchard, given everything they had.

"So either that[,] that he intended to kill—or here's your other option. Option two. Participation began before or during the killing, participation began. Well, probably—hard to say exactly, but 28, 29 hours before the actual killing. Defendant was a major participant in the crime. Yes. And to participate in the crime with reckless indifference to human life. You engage in kidnapping. You tie somebody up. You're involved in that. You are acting with reckless indifference driving out in the orchard like that.

"So you first have to find that[,] and here the two—the specific special circumstances that are at issue in this case. And you'll see this on the—on the charging document and again the verdict form you get it will have a charge for first-degree murder. And then after that, it will say 'special circumstances.' Then you have to figure out—circle whether or not you think it was true or not true that this special circumstance was proven. This one. Convicted of more than one murder. That's pretty simple. You have to show there that they were two or more people killed in a case. And here, obviously, there's no dispute that both [victims] were killed.

"The second special circumstance, which is charged, will be on your verdict forms as well. It will have the charge for first-degree murder. It will have a special circumstance one, true or not true. Special circumstance two—this one—true or not true. And you circle the one you think is appropriate. This one is intentional murder while engaged in a ... kidnapping. Did an act on a substantial factor [sic] in causing the death, and intended the other person to be killed.

"Don't confuse it with the felony murder rule. All the felony murder rule requires is the intent to aid and abet, conspire to commit a kidnapping. That's it. That makes you liable for first-degree murder. This is something else on top of that called 'special circumstance,' which requires the intent to kill and requires the defendant being a substantial factor as opposed to just merely aiding and abetting in some way."

In these remarks, the prosecutor appeared, at one point, to assert erroneously that intent to kill and major participant/reckless indifference were both options the jury could use in finding either special circumstance. At others, he indicated correctly that at least the kidnapping special circumstance elements could be satisfied by intent to kill only.

If we were persuaded that these equivocations meant there could be a reasonable doubt regarding whether the jury actually found Heliodoro intended to kill the victims, we would have to reverse both special circumstances. This in turn would mean the two sentences of life without parole would have to be reversed.

But the kidnapping special circumstance instruction was clear on the element of intent to kill, and the jury was directed to follow the court's instructions, and to disregard counsel's comments on the law if they were in conflict with the instructions. We assume, absent indications to the contrary, that a jury is capable of following the court's instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) As we have already indicated, the finding of intent to kill for the kidnapping special circumstance serves to resolve any uncertainty arising from the instructional error on the multiple murder special circumstance. The jury could not rationally find intent to kill as to one but not the other, since both applied to the same facts. Despite the mistake in the prosecutor's argument, we remain convinced that the instructional error on the multiple murder special circumstance was

18

1    harmless beyond a reasonable doubt.

2    <u>Silva</u>, 2019 WL 3714594, at *16-18.

3           Like the first claim, the state court reasonably determined that the erroneous instruction on

4    multiple murder special circumstance was harmless.  As set forth above, the instruction on the

5    kidnapping special circumstance was clear on the element of intent to kill.  With respect to that

6    instruction, the jury clearly found that Petitioner possessed the intent to kill. Insofar as both the

7    kidnapping and multiple murder special circumstances concerned the same two killings, the state

8    court reasonably determined that the jury could not have found an intent to kill on the kidnapping

9    special circumstance, but not the multiple murder special circumstance.  Thus, the state court

10   determination that the error was harmless was not objectively unreasonable, and the claim should

11   be denied.

12          3.      Instructional Error – "Other Crimes"

13          Petitioner next contends that the instruction on the use of other crimes (CALCRIM No.

14   375) improperly lowered the prosecution's burden of proof.  Petitioner also raised this claim on

15   direct review.  The appellate court rejected the claim as follows:

16
17          Salvador testified about the picture or video he saw on Gerardo's phone, taken 15
            to 20 days before the charged offenses, of two people tied up. Gerardo told
18          Salvador these men had been seized and brought to one of Heliodoro's houses,
            earlier in an effort to find and punish those who stole the marijuana. One of them
19          was kneeling and had his eyes covered, and someone was pouring water on him.
            Gerardo said the man had been told the water was acid, and he was screaming in
20          fear. Heliodoro told Salvador he was not involved in this activity, but also stated
            that he had turned on a weed eater within the men's hearing, so they would think
21          he had a chain saw and be frightened into naming the thieves. This testimony was
            admitted into evidence for the purpose of showing motive and absence of mistake
22          within the meaning of Evidence Code section 1101, subdivision (b).

23          The jury was instructed with CALCRIM No. 375 on the limited purposes for
            which this evidence could be used. The instruction included the statement that the
24          jury could use the evidence if it found the People had proved the uncharged
            conduct by a preponderance of the evidence.

25          Heliodoro now argues that, by applying the preponderance standard to findings
26          claimed to have relevance to his guilt or innocence (by showing he had not made a
            mistake about his accomplices' intentions, for instance) the use of this instruction
27          improperly lowered the prosecution's burden of proof.

28          Our Supreme Court rejected the same argument in *People v. Carpenter* (1997) 15
            Cal.4th 312, overruled on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176,

                                            19

1189, 1191. The high court held that application of the preponderance standard to proof of uncharged conduct relevant to the defendant's intent to commit the charged offenses was valid and did not lower the prosecution's burden of proof. (*Id*. at p. 382.)

Heliodoro cites *People v. Nicolas* (2017) 8 Cal.App.5th 1165, but it is not on point. The Court of Appeal held that it was error to admit, as prior bad act evidence under Evidence Code section 1101, subdivision (b), evidence that the defendant had been texting and making phone calls while driving, just before the collision for which he was charged with vehicular manslaughter with gross negligence. This was evidence of the negligence itself, so the jury should not have been instructed to weigh it under the preponderance standard. (*Nicolas, supra*, at pp. 1178-1180.) Heliodoro tries to connect *Nicolas* to this case by describing the prior conduct evidence as "transactionally related" to the charged offenses, but this is unavailing. The fact that activity 15 to 20 days earlier also was motivated by a desire to find and punish marijuana thieves does not make that activity part of the same transaction as the current offenses.

Heliodoro next contends that the court erred because the instruction it gave said, "The People must still prove every charge and allegation beyond a reasonable doubt." He asserts that the "instruction was modified to delete the phrase 'each element' from" this sentence.

The current version of the pattern instruction does not include that phrase. (See CALCRIM No. 375.) Earlier versions did include it. (See, e.g., CALCRIM No. 375 (Fall 2006 ed.) at p. 119.) Apart from stating that the newer text "exacerbated the error," Heliodoro does not explain what difference it makes, and he cites no authority on the topic. We will not discuss it further. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com*. (1999) 21 Cal.4th 352, 366, fn. 2 [unsupported points deemed forfeited]; *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324 [same].)

The instruction given by the court stated that the uncharged conduct evidence was "not sufficient by itself to prove that the defendant is guilty of Kidnapping and/or Murder or that the enhancement allegations of Personal Use of a Firearm and Principal Armed with a Firearm have been proved." Heliodoro points out that the court here omitted a reference to the special circumstance allegations added to the murder charges. He says this omission "suggested" the uncharged conduct evidence *was* sufficient by itself to prove the special circumstances. We agree that the special circumstances ought to have been mentioned, along with the other charged matters, assuming these matters needed to be listed at all in this instruction. But we are persuaded that the omission surely did not affect the verdict. Finding the kidnapping and multiple murder special circumstances—and nothing else—true based on the prior conduct evidence alone would have been wholly illogical in light of the court's entire charge to the jury. Speculation that the jury could have acted irrationally is no indication of prejudicial error.

Heliodoro states that the prior uncharged conduct evidence was insufficient as a matter of law to prove that a prior kidnapping took place, because it included nothing to support the asportation element of kidnapping. The men in the picture might have entered the house willingly and only been restrained against their will once inside. But Heliodoro cites no authority and provides no argument in support of the view that prior uncharged conduct evidence is admissible only if it is sufficient to prove that the prior conduct included all the elements of a specified criminal offense. In fact, Evidence Code section 1101, subdivision (b), refers to

20

1       admission of evidence that "a person committed a crime, civil wrong, or other act." The prior tying up and tormenting of people suspected of stealing marijuana could be relevant to the present case, if proved by a preponderance of the evidence, even if did not amount to kidnapping. Heliodoro has identified no error on this point.

Finally, observing that Salvador was an accomplice to the *currently charged offenses*, Heliodoro claims that, under section 1111, his testimony on the *prior uncharged conduct* was inadmissible because there was no other evidence of that conduct. This is not correct. Section 1111 provides that uncorroborated accomplice testimony alone is insufficient to prove a crime. But prior uncharged conduct evidence can be admissible even if the conduct was not a crime, so Salvador's testimony about such conduct did not need to prove a crime. And there is no indication that Salvador was in any way involved in the uncharged conduct, so his testimony was not accomplice testimony with respect to that conduct. Section 1111 thus has no bearing on the admissibility of this evidence. Heliodoro cites *People v. Bowley* (1963) 59 Cal.2d 855, but that case contains nothing to support his contention. It held that film footage showing the defendant committing the charged offenses would have been sufficient under section 1111 to corroborate an accomplice's testimony, but for the fact that the accomplice's testimony also was the foundation for the introduction of the footage into evidence. (*Bowley, supra*, at p. 863.)

Silva, 2019 WL 3714594, at *18-20.

       a.      Legal Standard and Analysis

Initially, the Court notes that the admissibility of evidence is generally a matter of state law. Estelle, 502 U.S. at 67-68 (state evidentiary ruling cannot provide ground for federal habeas relief unless the admission of evidence violated due process). To the extent Petitioner claims the instruction violated California law, the claim is not cognizable.

Petitioner also fails to demonstrate that the instruction was contrary to or an unreasonable application of Supreme Court authority. As noted by Respondent, the Supreme Court has approved of the use of the preponderance of evidence standard with respect to prior crime evidence under the Federal Rules of Evidence. See Huddleston v. United States, 485 U.S. 681, 687 (1988); Bourjaily v. United States, 483 U.S. 171, 176 (1987). Thus, jury instructions on prior crime evidence that use the preponderance of evidence standard are consistent with Supreme Court authority.

In any event, the jury was instructed that the prior crime evidence was "not sufficient by itself to prove that the defendant is guilty of Kidnapping and/or Murder or that the enhancement allegations of Personal Use of a Firearm and Principal Armed with a Firearm have been proved."

1   <u>Silva</u>, 2019 WL 3714594, at *19.  The jury is presumed to follow the instructions given, and

2   Petitioner fails to show that the jury disregarded the instructions.  <u>Doe v. Busby</u>, 661 F.3d 1001,

3   1017 (9th Cir. 2011).  The jury was instructed on the limited use of the prior acts evidence, that

4   the evidence could not be relied on by itself to prove guilt, and that all elements of the crimes

5   must be proven beyond a reasonable doubt.  The claim should, therefore, be denied.

6              4.      Sentencing Error – California Penal Code § 654

7          Petitioner next alleges that the trial court committed sentencing error by failing to stay the

8   sentences on counts three and four for simple kidnapping.  Such a claim does not give rise to a

9   federal question cognizable on federal habeas review.  <u>Lewis v. Jeffers</u>, 497 U.S. 764 (1990);

10  <u>Sturm v. California Youth Authority</u>, 395 F.2d 446, 448 (9th Cir. 1967) ("a state court's

11  interpretation of its [sentencing] statute does not raise a federal question").  To state a claim for

12  relief, Petitioner must demonstrate that the state committed sentencing error, and that the error

13  was "so arbitrary or capricious as to constitute an independent due process" violation.  <u>Richmond</u>

14  <u>v. Lewis</u>, 506 U.S. 40 (1992).  Petitioner has failed to demonstrate such a violation here, because

15  on its face, the petition shows no sentencing error or arbitrariness.

16             5.      Instructional Error – Implied Malice

17         Petitioner contends that the court violated his constitutional rights when it instructed on

18  implied malice as a theory of conspiracy to murder.  The claim was rejected by the appellate court

19  as follows:

20         The jury was instructed on conspiracy as a theory of murder: Heliodoro could be
           found guilty of murder if he was part of a conspiracy to murder and the killings
21         were carried out by his coconspirators. The instructions the jury was given on
           murder included instructions that a murder conviction can be based on a finding of
22         implied malice. Heliodoro correctly points out that there is no such thing as a
           conspiracy to commit implied malice murder. If murder is the object of the
23         conspiracy, the conspiracy necessarily involves an intent to kill and premeditation.
           (*Cortez, supra*, 18 Cal.4th at pp. 1237-1238.) Heliodoro contends that it was
24         reversible error to give both the conspiracy instructions and the implied malice
           instructions because the jury could have used these to construct an incorrect theory
25         of murder. We disagree.

26         It is true that a conspiracy to *commit murder*—regardless of whether it is charged
           as conspiracy (§ 182) or as murder (§ 187)—is necessarily a conspiracy to commit
27         first degree premeditated murder. Nevertheless, contrary to Heliodoro's contention,
           instructions on implied malice murder and instructions on conspiracy can properly
28         be used in combination as a basis for a conviction on a charge of murder. As noted

                                                    22

above, a conspiracy to *kidnap*, plus murder furthering the conspiracy, by a member of the conspiracy, as a natural and probable consequence of the conspiracy to kidnap, is a basis for a conviction of second degree murder. (*Vega-Robles, supra*, 9 Cal.App.5th at p. 418.) The point in *Vega-Robles* was that, even if the direct perpetrator of the murder acted with intent to kill and premeditation in this situation, and even if that type of murder was a natural and probable consequence of the conspiracy, this would still be second degree murder under *Chiu, supra*, 59 Cal.4th at pages 158-159. But there is no reason why a verdict of second degree murder for a kidnapping conspirator could not be arrived at similarly where the direct perpetrator of the murder acted only with implied malice. Consequently, there is nothing inherently wrong, in a case in which murder is charged, with giving both implied malice instructions and conspiracy instructions. If a kidnapping conspiracy leads to an implied malice murder as a natural and probable consequence, the conspirators are guilty of that murder.

Nor do we see any danger of jury confusion under the particular circumstances of this case. The instructions explained that express malice is the intent to kill and implied malice involves conscious disregard for life but stops short of the intent to kill. They explained that a murder committed not only with the intent to kill but also with willfulness, deliberation and premeditation, is first degree murder. And they explained that a conspiracy to commit murder involves the defendant's agreement to commit murder, and his intention at the time of the agreement that one or more conspirators would commit it.

Having heard these instructions, the jury did not need to be told expressly that if it found Heliodoro guilty of murder on a theory of conspiracy to murder, the murder in question would necessarily involve an intent to kill and premeditation on his part. The language of the conspiracy instruction operated to exclude a verdict of murder based on implied malice where the murder is the object of the conspiracy, because it stated that the jury must find the conspirators agreed in advance to commit murder. That agreement would not be consistent with an absence of an express, and indeed a considered, intent to kill on the part of the conspirators. At the same time, the instructions properly allowed the jury to reach a verdict of second degree murder by determining that Heliodoro conspired with the others to commit kidnapping, and that during the kidnapping his coconspirators committed the murders—which could have been implied malice murders—as a natural and probable consequence of the kidnappings.

Had the jury reached verdicts of first degree murder in a similar manner—viewing first degree murder as a natural and probable consequence of the conspiracy to kidnap—that would have been error, as discussed in section I.C. above; but as we have said, the error in the instructions of allowing that possibility was harmless.

Assuming, as we do, that jurors follow instructions, we conclude the jury could not erroneously return a verdict of *murder* based on a conspiracy to murder combined with implied malice. It could have returned a verdict of second degree murder based on a conspiracy to *kidnap* combined with a finding of killing with implied malice, using the natural and probable consequences doctrine, but that would have been permissible. (And, as discussed in part I.C. above, such a verdict would not automatically amount to first degree felony murder.) Taking the court's charge to the jury as a whole, we conclude there was no danger of the kind of misunderstanding Heliodoro describes, and no error.

And once again, any deficiency in the instructions on other theories of murder was harmless because the jury's true findings on the felony murder special

23

1   circumstance, and its verdicts of kidnapping, prove that it actually found all that
2   needed to be found for verdicts of first degree felony murder, thus obviating the
    danger of improper verdicts based on erroneous instructions.

3   Silva, 2019 WL 3714594, at *15-16.

4            a.      Legal Standard and Analysis

5          The state court determined that the instructions given were correct as a matter of state law.

6   This Court is bound by the state court determination of state law.   Bradshaw v. Richey, 546 U.S.

7   74, 76 (2005).

8          Moreover, any possible error in the given instructions was harmless.   As noted by the state

9   court, the jury found all of the elements necessary for first degree felony murder when it found

10  true the felony murder special circumstance and kidnapping charge.   Petitioner fails to

11  demonstrate that the state court rejection was contrary to, or an unreasonable application of,

12  Supreme Court authority, nor can he establish any prejudice.   The claim should be denied.

13           6.      Instructional Error – Mental State

14         In his final claim for relief, Petitioner alleges that the instructions given allowed the jury

15  to convict him of murder on an aiding and abetting theory without the specific intent to kill, in

16  violation of his constitutional rights.   In rejecting the claim, the appellate court found as follows:

17         Heliodoro maintains that the trial court erred not giving instructions that (1) "[i]n
           order to find appellant guilty of murder on an aiding and abetting theory, the jury
18         was required to find that the actual perpetrator had the specific intent to kill, or
           express malice"; and (equivalently) (2) "the direct perpetrator must have the
19         specific intent to kill in order to find appellant guilty of murder on an aiding and
           abetting theory." Further, (3) the "jury was erroneously instructed on implied
20         malice, because no theory of guilt of first degree murder could be based on the
           implied malice of either appellant or the actual perpetrator."
21
           As a preliminary point, proposition (3) presupposes that the jury could not have
22         reached a verdict of *second* degree murder based on the implied malice of
           Heliodoro or a perpetrator aided and abetted by him. We see no reason why not,
23         and Heliodoro proposes no reason. For instance, the jury could have taken the
           view that although the actual killers intended to kill the victims, Heliodoro never
24         heard this or was convinced they would not go through with it, and his assistance
           and encouragement were done only with a conscious disregard for life.
25
           Even putting that preliminary point aside, instructions based on these contentions
26         would have been incorrect. The effect of *People v. Beeman* (1984) 35 Cal.3d 547
           (*Beeman*), the case relied on by Heliodoro, is only that *if* the direct perpetrator had
27         a particular type of intent (such as express malice), *then* the aider and abettor had
           to have the same (or a more culpable) intent in order to be guilty of a *crime*
28         *requiring that intent*, because the aider and abettor does not automatically become

                                                24

guilty of the same crime as the direct perpetrator by helping the direct perpetrator do the criminal act while merely *knowing* of the direct perpetrator's purpose, and having no particular purpose of his or her own. Contrary to Heliodoro's supposition, *Beeman* does not demand that a direct perpetrator and an aider and abettor have the same mens rea. It also does not demand that the direct perpetrator have a mens rea more culpable than that of the aider and abettor, or vice versa. Instead, each actor has the mens rea shown by the evidence and the crime of which each is guilty, if any, is determined accordingly.

Beeman was convicted of robbery as an aider and abettor after the direct perpetrators committed robbery in his absence but with his encouragement. The question on appeal was whether CALJIC No. 3.01, as it was at the time, correctly stated the elements of aiding and abetting. (*Beeman, supra*, 35 Cal.3d at pp. 550-551.) The Supreme Court held that the pattern instruction was inadequate, because it did not require "proof that an aider and abettor rendered aid with an intent or purpose of either committing, or of encouraging or facilitating commission of, the target offense." (*Id*. at p. 551.)

At the time of *Beeman*, CALJIC No. 3.01 only required proof that the defendant aided and abetted with knowledge of the direct perpetrator's purpose. It did not also require proof that the defendant himself or herself have a purpose of aiding in the accomplishment of that purpose. (*Beeman, supra*, 35 Cal.3d at pp. 554-555.) The Supreme Court held that this was contrary to the law, and it reversed Beeman's conviction, accepting his argument that "the instruction given permitted the jury to convict him of the same offenses as the perpetrators without finding that he harbored either the same criminal intent as they, or the specific intent to assist them." (*Id*. at p. 555.) After examining competing authorities, the court concluded that the law requires "proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose of either committing, or of encouraging or facilitating commission of, the offense." (*Id*. at p. 560.) Further, "[w]hen the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator." (*Ibid*.) Beeman's defense was that although he knew of the direct perpetrators' intentions, and gave them information they needed to carry out those intentions, he wanted nothing to do with the robbery and did not intend that it should be carried out. The Supreme Court concluded that, under these circumstances, the conviction could not be upheld where the jury was not told it must find the defendant shared in the direct perpetrators' criminal intent. (*Id*. at pp. 562-563.)

Heliodoro's argument appears to suggest that the meaning of *Beeman* is that an aider and abettor's criminal intent must be coextensive with—no more and no less than—that of the direct perpetrator, and where it is otherwise, the aider and abettor is not just not guilty of the same offense as the direct perpetrator, but not guilty of any offense. This understanding of *Beeman* would explain why Heliodoro thinks the jury should have been told he could not be guilty as an aider and abettor of any type of murder requiring express malice unless the direct perpetrators had that mental state as well—and, more specifically, he cannot be guilty of first degree premeditated murder if the direct perpetrators' mens rea was only implied malice.

But there is no rule like the one Heliodoro attempts to extract from *Beeman*. If an aider and abettor of a criminal act has a greater or lesser mens rea than a direct perpetrator of the same act, the aider and abettor can be guilty of a correspondingly greater or lesser offense.

1    Our Supreme Court affirmed this principle going in one direction—an aider and
2    abettor can be guilty of a greater offense than a direct perpetrator on account of the
     aider and abettor's more culpable mental state—in *People v. McCoy* (2001) 25
     Cal.4th 1111, 1118-1119 (*McCoy*):

3
4         "As stated in another work by Professor Dressler, 'many commentators
          have concluded that there is no conceptual obstacle to convicting a
          secondary party of a more serious offense than is proved against the
5         primary party. As they reason, once it is proved that "the principal has
          caused an *actus reus*, the liability of each of the secondary parties should
6         be assessed according to his own *mens rea*." That is, although joint
          participants in a crime are tied to a "single and common *actus reus*," "the
7         individual *mentes reae* or levels of guilt of the joint participants are
          permitted to float free and are not tied to each other in any way. If their
8         *mentes reae* are different, their independent levels of guilt ... will
          necessarily be different as well."' (Dressler, Understanding Criminal Law
9         (2d ed. 1995) § 30.06[C], p. 450, fns. omitted.)

10        "Professor Dressler explained how this concept operates with homicide.
          'An accomplice may be convicted of first-degree murder, even though the
11        primary party is convicted of second-degree murder or of voluntary
          manslaughter. This outcome follows, for example, if the secondary party,
12        premeditatedly, soberly and calmly, assists in a homicide, while the
          primary party kills unpremeditatedly, drunkenly, or in provocation.
13        Likewise, it is possible for a primary party negligently to kill another (and,
          thus, be guilty of involuntary manslaughter), while the secondary party is
14        guilty of murder, because he encouraged the primary actor's negligent
          conduct, with the intent that it result in the victim's death.' (Dressler,
15        Understanding Criminal Law, supra, § 30.06[C], p. 450.)" (*McCoy, supra*,
          25 Cal.4th at p. 1119.)
16
17   In *McCoy*, the court suggested that the principle also works in reverse: an aider
     and abettor with a lower level of mens rea than a direct perpetrator can be guilty of
     a correspondingly lesser offense, instead of being absolved of liability altogether:
18   "The same principles should apply whenever a person aids, or perhaps induces,
     another to kill, whether that other person is entirely innocent ... or less culpable, as
19   possibly here*, or, potentially, more culpable*. In any of these circumstances, each
     person's guilt would be based on the combined *actus reus* of the participants, but
20   also solely on that person's own *mens rea*. Each person's level of guilt would '
     "float free."' (Dressler, Understanding Criminal Law, supra, § 30.06[C], p. 450.)"
21   (*McCoy, supra*, 25 Cal.4th at p. 1121, italics added.)

22   Recently, our Supreme Court acknowledged the reverse direction in unequivocal
     terms: "Defendants correctly observe that ... an actual killer and an aider/abettor
23   are not always guilty of the same offense. Rather, [putting aside felony murder and
     aiding and abetting under the natural and probable consequences doctrine] the
24   aider/abettor's guilt is based on the combined acts of all the principals and on the
     aider/abettor's own knowledge and intent. Consequently, in some circumstances an
25   aider/abettor may be culpable for a greater or lesser crime than the actual killer."
     (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 917-918.)
26
27   In other words, to be guilty of a crime as serious as or more serious than a direct
     perpetrator's, an aider and abettor must have the same mental state as a direct
     perpetrator or a more culpable mental state. If a direct perpetrator had only implied
28   malice and was guilty of second degree murder, an aider and abettor could be

                                         26

1    guilty of that offense or other offenses, depending on the aider and abettor's mental
     state. Thus the aider and abettor could be guilty of second degree murder by
2    intentionally helping the direct perpetrator do the act that caused death, at the same
     time being consciously indifferent to that act's danger to human life. Or the aider
3    and abettor could be guilty of second degree murder by intentionally helping the
     direct perpetrator do that act while intending the victim to be killed. Or the aider
4    and abettor could be guilty of first degree murder by premeditating the killing of
     the victim, and then intentionally helping the direct perpetrator do the act and
5    intending the victim to be killed by it, even though the direct perpetrator does not
     so intend. All these outcomes would be logically consistent with the direct
6    perpetrator having acted with implied malice only (or even mere negligence, as
     indicated in *McCoy*).
7
     Conversely, if a direct perpetrator was guilty of first degree murder based on
8    express malice and premeditation, an aider and abettor could be guilty of second
     degree murder if intending to help the direct perpetrator do the fatal act, and at
9    same time being consciously indifferent to that act's danger to human life, or
     intending without premeditation that the direct perpetrator's act would kill the
10   defendant.

11   The rule of *Beeman*, *McCoy*, and *Amezcua* is broken only if one party is found
     guilty of a crime equal to or greater than that of the other while having a mental
12   state less culpable than the other's. The jury could not find, for instance, that where
     the direct perpetrator acted with an intent to kill and premeditation and was guilty
13   of first degree premeditated murder, the aider and abettor also was guilty of first
     degree premeditated murder despite having only implied malice, or express malice
14   but no premeditation.

15   For these reasons, Heliodoro is mistaken in his argument that the trial court erred
     by not instructing the jury that he could not be guilty of murder on a theory of
16   direct aiding and abetting unless he and the direct perpetrators all intended to kill.

17   Finally, even if there were any such error, it would be harmless beyond a
     reasonable doubt. The jury's felony murder special circumstance finding
18   established that Heliodoro was guilty of first degree felony murder, as explained
     above. The purported error in the instructions on murder by direct aiding and
19   abetting would not have affected the outcome.

20   Silva, 2019 WL 3714594, at *12-15.

21          a.      Legal Standard and Analysis

22          The state court determined that the instructions sought by Petitioner would have been

23   incorrect under California law.  This Court is also bound by the state court interpretation of state

24   law.  Bradshaw, 546 U.S. at 76.  In addition, any error in the instructions was harmless.  As

25   previously discussed, in finding Petitioner guilty of the kidnapping special circumstance, the jury

26   found all of the elements necessary for first degree felony murder.  Thus, Petitioner fails to

27   demonstrate any prejudice.  The claim should be denied.

28

                                      27

1   **IV.     RECOMMENDATION**

2          Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas

3   Corpus be DENIED with prejudice on the merits.

4          This Findings and Recommendation is submitted to the United States District Court Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

6   Local Rules of Practice for the United States District Court, Eastern District of California.  Within

7   thirty (30) days after being served with a copy of this Findings and Recommendation, any party

8   may file written objections with the Court and serve a copy on all parties.  Such a document

9   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

10  to the Objections shall be served and filed within fourteen (14) court days (plus three days if

11  served by mail) after service of the Objections.  The Court will then review the Magistrate

12  Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file

13  objections within the specified time may waive the right to appeal the Order of the District Court.

14  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15

16  IT IS SO ORDERED.

17  Dated:   **January 28, 2022**                              */s/ Sheila K. Oberto*

18                                                           UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28